830 F.2d 1107
 E & T REALTY, etc., and Charles D. Beard, Jr., an
individual, Plaintiff-Appellee,
v.
Edwin A. STRICKLAND, Richard L. Straub, Jack W. Swann, O.C.
Moon, and Robert Erwin, individually and in their capacities
as Members of the Jefferson County Sewer Moratorium
Committee, and Charles H. Doss, Ray Moore, and David Orange,
individually and in their capacities as Members of the
Jefferson County Commission, Defendants-Appellants.
 No. 86-7501.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 26, 1987.
 
 De Martenson, Huie, Fernambucq & Stewart, Rebecca L. Shows, Birmingham, Ala., for defendants-appellants.
 Joe R. Whatley, Jr., Falkenberry, Whatley & Heidt, Birmingham, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 This case involves allegedly discriminatory administration of facially neutral legislation. Defendants are county personnel who administer a sewer moratorium resolution. Plaintiffs are property owners. According to plaintiffs, defendants treated them unequally by denying their application for an increased sewer allocation while allowing other persons to increase their sewage.
 
 
 2
 The district court found an equal protection violation. Because the district court failed to make certain findings and applied an incorrect legal standard, we vacate and remand.
 
 I. Factual and Procedural Background
 
 3
 In early 1976, Jefferson County, Alabama suffered from a severe shortage of sewerage facilities. On February 17, 1976, the Jefferson County Commission imposed by resolution a moratorium on further connections with the Patton Creek and Cahaba River sewer systems. The resolution created three exceptions to the sewer connection moratorium: (1) connections indicated on preliminary subdivision plans which had been approved prior to February 10, 1976; (2) connections for unimproved lots within existing subdivisions; and (3) connections for improved lots which had alternate sewage disposal systems. In a subsequent resolution on September 17, 1977, the Commission repealed these three exceptions.
 
 
 4
 On July 5, 1978, the Commission further amended the resolution to provide that:
 
 
 5
 Only such connections, reconnections, expansions, and changed uses of properties connected to [the Cahaba and Patton sewage] systems (before or after the moratorium) are or will be authorized as will not impact the sewer systems greater than the impact from such properties in the most recent former use of such properties.
 
 
 6
 The Jefferson County Commission created the Jefferson County Sewer Moratorium Committee to administer the moratorium resolution. Defendants/appellants Edwin Strickland, Richard Straub, Jack Swann, O.C. Moon, and Robert Erwin are members of the Moratorium Committee. Defendants/appellants Charles Doss, Ray Moore, and David Orange are members of the Commission.
 
 
 7
 Plaintiffs/appellees are E & T Realty, an Alabama general partnership, and Charles Beard, its managing partner. In 1980, E & T Realty purchased a three-story building called the MacMillan Building, located at 1945 Hoover Court, City of Hoover, Jefferson County, Alabama. From 1980 to 1983, the building was mostly vacant.
 
 
 8
 In the early part of the summer of 1983, Lloyd Noland Hospital offered to lease about 3000 square feet of space in the MacMillan Building for use as an outpatient clinic and to pay E & T Realty $2,200 per month for three years, commencing in July 1983. Lloyd Noland also offered to make improvements to the building in the approximate amount of $100,000.00.
 
 
 9
 E & T Realty requested permission from the Sewer Moratorium Committee to relocate existing plumbing fixtures in the MacMillan Building to provide for the water needs of its potential tenant, Lloyd Noland. In a written application filed with the Committee on August 10, 1983, E & T asked that the MacMillan Building, after relocation of the plumbing fixtures, be allowed to use 5,300 gallons per day (g.p.d.). Later, in a letter dated August 29, 1983, it requested an "unrestricted permit" to relocate the plumbing fixtures. Ultimately, at a hearing on September 16, 1983, E & T Realty requested a sewer allocation of at least 800 to 1000 g.p.d.
 
 
 10
 The Moratorium Committee took the position that the plumbing fixtures could be relocated only if, after relocation of such fixtures, the water use of the MacMillan Building would not exceed its "most recent former use." To determine "most recent former use," the Moratorium Committee used its standard method of examining water department records. These records indicated that the average daily use during the previous three years, 1980-1983, was 395 g.p.d. and during the previous sixteen years, 1967-1983, was 448 g.p.d.
 
 
 11
 The Moratorium Committee indicated that it would authorize a sewer allocation of about 448 g.p.d. But it refused to approve E & T Realty's application because E & T was asking for at least twice that amount.
 
 
 12
 Without approval of its application, E & T Realty was unable to supply Lloyd Noland's water needs. Therefore, the hospital decided in September 1983 to look elsewhere. Ultimately, Lloyd Noland leased space for its clinic from a different landlord, Mitchell Joseph, in a new building several blocks away from the MacMillan Building. The Moratorium Committee had approved Joseph's sewer connection application in 1979, subject to a 5130 g.p.d. limitation.
 
 
 13
 On October 27, 1983, plaintiffs filed a lawsuit pursuant to 42 U.S.C. sec. 1983, claiming that defendants' denial of their sewerage application violated their constitutional rights to equal protection, due process, and just compensation for property taken by the government. In this complaint, plaintiffs alleged that defendants had "selectiv[ely] enforc[ed]" the sewer moratorium resolution. Plaintiffs alleged that "[w]ithout justification, defendants have allowed the additional sewage from Joseph's building." In addition, the complaint alleged that defendants had, without justification, allowed nearby restaurant owners to increase the sewage flow from their buildings.
 
 
 14
 A bench trial was conducted beginning March 18, 1985. Plaintiffs conceded at trial that they were not challenging the sewer moratorium, itself; rather, they were challenging defendants' administration of the moratorium resolution. Plaintiffs' taking and due process claims were dismissed during the trial.
 
 
 15
 On December 31, 1985, the district court entered a memorandum opinion holding that defendants violated plaintiffs' right to equal protection. The district court found:
 
 
 16
 There has been no showing of any difference between Mitchell Joseph in 1979 and E & T Realty in 1983. The defendants have not shown any rational basis for the granting of the 5,130 gpd allocation to Mitchell Joseph and the denial of the 1,000 gpd allocation to E & T Realty.... The Court concludes that the difference in the defendants' treatment of E & T Realty and Mitchell Joseph is irrational, arbitrary, and capricious.
 
 
 17
 Implicitly, the court adopted the following legal standard: a plaintiff establishes an equal protection violation by showing an arbitrary and irrational difference between the results of two particular applications of a facially neutral statute.
 
 
 18
 On the same day, the district court entered an injunction, ordering defendants to grant plaintiffs a sewer allocation of at least 1000 g.p.d. and to authorize relocation of the existing plumbing fixtures in the MacMillan Building. Also, the court awarded attorney fees to plaintiffs. On June 25, 1985, the district court awarded plaintiffs damages in the amount of $161,920.00. Defendants timely appealed.[1]
 
 
 19
 II. Whether Joseph and E & T Realty Were Similarly Situated
 
 
 20
 Defendants argue that Joseph and E & T Realty were not similarly situated. Under the terms of the moratorium resolution, defendants contend, Joseph was entitled to approval of his application but E & T Realty was not.
 
 
 21
 This argument, if correct, would eliminate plaintiffs' equal protection claim to the extent it is based on the difference in treatment between Joseph and E & T Realty. Different treatment of dissimilarly situated persons does not violate the equal protection clause.
 
 
 22
 Our review of this issue is hampered by a lack of district court findings; the district court never explicitly determined whether E & T Realty or Joseph was entitled to approval of its application. From the record, it is clear that E & T was unentitled to approval of its application. Whether Joseph was entitled to approval of his, however, cannot be determined from the record on appeal.
 
 
 23
 Under the terms of the moratorium resolution, E & T Realty was not entitled to a sewer allocation in excess of the MacMillan Building's "most recent former use." The Moratorium Committee determined most recent former use by examining water department records, a reasonable method previously approved by the Alabama Supreme Court. Peterson v. Jefferson County, 372 So.2d 839 (Ala.1979). These water records showed that the average water use was 395 g.p.d. during 1980 to 1983 and 448 g.p.d. during 1967 to 1983. During a period of maximum utilization of the building, 1967-1975, an average of 607 g.p.d. was used.
 
 
 24
 In this case, there is no need to determine whether the 395 g.p.d., 448 g.p.d., or 607 g.p.d. figure best represents the most recent former use. Certainly, such use was not greater than 607 g.p.d. E & T Realty requested at least 800 to 1000 g.p.d., a figure substantially in excess of the "most recent former use." Thus, defendants properly denied E & T's application.
 
 
 25
 From the record on appeal, it is impossible to determine whether Joseph was entitled to approval of his application in 1979. Apparently, Joseph's property originally fit within the subdivision plan exception to the moratorium. In a letter dated September 7, 1977, defendants authorized Joseph's application for a sewer connection, subject to the following condition: "[t]his approval shall automatically terminate and no connection will be allowed unless substantial construction is begun in accordance with the proposed plans within 180 days of this letter." In this letter, "substantial construction" was defined as "at a minimum, the sanitary sewer construction shall have been completed and construction of 50% of the proposed buildings are above ground level." Moreover, the letter provided that "[t]his approval is limited to a maximum of 5130 gallons per day." There were three proposed buildings: a two-story bank building, a fast food restaurant, and a motel.
 
 
 26
 The district court found that "construction of 50% of these proposed buildings" was not accomplished within 180 days of the letter--that is, by February 7, 1978. Therefore, the district court found that the conditional approval of Joseph's application automatically terminated by its own terms as of mid-February 1978.
 
 
 27
 On September 27, 1977, the Jefferson County Commission amended the moratorium resolution by repealing all of the original exceptions for the moratorium, including the subdivision exception on which the September 7 approval of Joseph's application had been based. This September 27, 1977, amendment created several new exceptions, including the following:
 
 
 28
 Also excluded from the moratorium are sewer connections for proposed construction which has received approval by the Jefferson County sewer moratorium committee prior to the date hereof but has not yet been permitted.
 
 
 29
 On July 5, 1978, the Jefferson County commission adopted another resolution regarding the moratorium. This July 5, 1978, resolution provided that:
 
 
 30
 the Jefferson County Commission did, in accordance with the moratorium stop all new connections to the system except for the exceptions set out therein and, further, the Commission, in subsequent resolutions, has removed all such exceptions to the moratorium for connections not already permitted except where instructed by the Health Department to the contrary.[2]
 
 
 31
 On March 22, 1979, Joseph wrote to defendant Straub, informing Straub that he had constructed the bank building but not the fast food restaurant or the motel. In place of the fast food restaurant, Joseph proposed to build a "family steakhouse" restaurant. In place of the motel, Joseph proposed to build six retail stores. By letter dated April 20, 1979, the Moratorium Committee approved Joseph's application for sewer connections for these two new buildings, subject to a 5130 g.p.d. limitation.
 
 
 32
 If the conditions on the 1977 approval of Joseph's first application were effective, it appears that Joseph's second application should have been denied in 1979. At the time defendants granted Joseph's application in 1979, his property no longer fit within the preliminary subdivision plan exception to the moratorium; this exception had been repealed in 1977. Nor, if the conditions on the first approval were effective, would the property have fit within the "approved but not yet permitted" exception in 1979. The first approval would have automatically terminated in February, 1978, as a result of Joseph's failure to comply with the "substantial construction" condition.
 
 
 33
 We cannot determine from the record on appeal, however, whether the Moratorium Committee had power to impose the conditions on its 1977 approval. Under Alabama law
 
 
 34
 rules and regulations and administrative action cannot subvert or enlarge upon the statutory policy or the rules or regulations therein set down. Administrative implementation cannot deviate from the principle and policy of the statute.
 
 
 35
 Alabama State Bd. of Optometry v. Busch Jewelry Co., 261 Ala. 479, 75 So.2d 121, 125 (1954); see also Jefferson County Bd. of Educ. v. Alabama Bd. of Cosmetology, 380 So.2d 913, 915 (Ala.Civ.App.1980).
 
 
 36
 If the conditions which the Committee purported to place on the September 7, 1977, approval were nugatory, then such approval never expired; and Joseph's property was covered by "approved but not yet permitted" exception when the Committee approved Joseph's second application in 1979. Under these circumstances, defendants' approval of Joseph's 1979 application would be proper; Joseph and E & T Realty would not be similarly situated under the terms of the moratorium resolution, and defendants' disparate treatment of them would not violate equal protection.
 
 
 37
 In the absence of any district court findings or conclusion on this issue we are reluctant to determine for the first time on appeal whether the conditions on the September 7, 1977 approval were effective. Whether an administrative action "subvert[s] or enlarge[s] upon statutory policy" is a complex question under Alabama law. See, e.g., Shellcast Corp. v. White, 477 So.2d 419 (Ala.Civ.App.1984), rev'd, sub nom. Ex parte White, 477 So.2d 422 (Ala.1985), on remand, Shellcast Corp. v. White, 477 So.2d 425 (Ala.Civ.App.1985). Therefore, we remand for a determination by the district court in the first instance whether the conditions imposed by defendants on their September 7, 1977 approval of Joseph's application were effective or mere surplusage.
 
 
 38
 Moreover, on remand, the district court should not assume that E & T Realty and Joseph were necessarily similarly situated even if the district court ultimately finds that both were unentitled under the terms of the moratorium resolution to approval of their applications. Of course, persons who are clearly unentitled to a permit are dissimilarly situated from persons who are clearly entitled to a permit. But also they are dissimilarly situated for purposes of the equal protection clause from persons who might be entitled to a permit.
 
 
 39
 A local government does not violate the equal protection clause by granting a permit to an applicant who has a nonfrivolous claim of entitlement under the pertinent legislation and by denying a permit to another applicant who is clearly unentitled to it: the two applicants are not similarly situated. Granting a permit to a person with a colorable claim is an entirely reasonable way to avoid the potential cost of litigation and an adverse judgment, as well as to ensure that no permit is unjustly denied. By granting a permit in an uncertain case, a local government is not thereby constitutionally foreclosed from denying it in a "clear" case or even in an appreciably clearer (but still somewhat unclear) case of unentitlement.
 
 
 40
 E & T Realty was clearly unentitled to approval of its application under the terms of the moratorium resolution. If the district court finds on remand that a county administrator could have reasonably concluded in 1979 that Joseph might be entitled to approval of his sewer connection,[3] then Joseph and E & T Realty would not be similarly situated for purposes of the equal protection clause. Only if both Joseph and E & T Realty were clearly unentitled to approval of their application would they be similarly situated.
 
 
 41
 III. Whether Defendants Purposefully Discriminated against Plaintiffs
 
 
 42
 A remand is necessary in this case for another reason: to prevail on a claim that defendant unequally applied a facially neutral statute, a plaintiff must show intentional discrimination. The district court made no findings regarding discriminatory intent.[4]
 
 
 43
 The district court erred in ruling that plaintiffs proved an equal protection violation merely by showing an arbitrary and irrational difference between the results of two particular applications of a facially neutral statute. Plaintiffs here are not challenging a classification created on the face of the statute; in such a case they could prevail by showing that the classification is not rationally related to a legitimate state purpose. See, e.g., Hooper v. Bernalilo County Assessor, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Rather, plaintiffs are alleging that defendants unequally applied facially neutral legislation.[5]
 
 
 44
 "The unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); see also, Tasby v. Estes, 643 F.2d 1103, 1107-08 (5th Cir. Unit A April 1981) (administration of student disciplinary rules and regulations);[6] Gamza v. Aquirre, 619 F.2d 449, 453-54 (5th Cir.1980) (misapplication of vote counting procedures). Thus, even if E & T Realty and Joseph were similarly situated, the fact that defendants treated them differently would not establish an equal protection violation absent proof that defendants acted with discriminatory intent.
 
 
 45
 Unequal administration of facially neutral legislation can result from either misapplication (i.e., departure from or distortion of the law) or selective enforcement (i.e., correct enforcement in only a fraction of cases). In either case, a showing of intentional discrimination is required. Snowden, supra (misapplication of Illinois election law resulting in plaintiff not being placed on primary ballot); Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir.1982) (incorrect application of prison transfer regulations); Bauza v. Morales Carrion, 578 F.2d 447, 451 (1st Cir.1978) (departure from published regulation governing admissions to school); Sunday Lake Iron Co. v. Wakefield Township, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918) (assessment of one taxpayers' property at full value while generally assessing other taxpayers' properties at fraction of value); Oyler v. Boyles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed. 446 (1961) (selective prosecution of criminal statute); United States v. Johnson, 577 F.2d 1304, 1308 (5th Cir.1978) (selective prosecution of criminal statute); Muckway v. Craft, 789 F.2d 517, 519-23 (7th Cir.1986) (selective enforcement of zoning law); Birth Control Centers, Inc. v. Reizen, 743 F.2d 352, 359 (6th Cir.1984) (selective enforcement of licensing requirements for freestanding surgical outpatient clinics); Harrington v. United States, 673 F.2d 7, 10-11 (1st Cir.1982) (unusually severe discipline of federal probationary employee); Tarkowski v. Robert Bartlett Realty Co., 644 F.2d 1204, 1206 (7th Cir.1980) (selective enforcement of zoning regulation); Barton v. Malley, 626 F.2d 151, 154-55 (10th Cir.1980) (selective enforcement of parole revocation guidelines); United States v. Torquato, 602 F.2d 564, 568-70 (3d Cir.) (selective enforcement of criminal statute), cert. denied, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979); Cook v. City of Price, 566 F.2d 699 (10th Cir.1977) (selective enforcement of zoning ordinance); Friedlander v. Cimino, 520 F.2d 318, 319-20 (2nd Cir.1975) (selective enforcement of licensing requirements for physicians).[7]
 
 
 46
 The Supreme Court has required purposeful discrimination in a case of allegedly unequal application of a facially neutral statute as recently as its 1986-87 Term. In McCleskey v. Kemp, --- U.S. ----, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), petitioner alleged that the facially neutral Georgia death penalty law was unequally applied based on the race of the murder victim. The Supreme Court held that petitioner failed to establish that application of the death penalty statute violated the equal protection clause because he failed to prove purposeful discrimination in his case. 107 S.Ct. at 1766-69.
 
 
 47
 Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause. There must be intentional discrimination. Snowden, 321 U.S. at 8, 64 S.Ct. at 401; Sunday Lake Iron Co., 274 U.S. at 353, 38 S.Ct. at 495; Ciechon v. City of Chicago, 686 F.2d 511, 522 (7th Cir.1982); Gamza, 619 F.2d at 453-54. Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause. Shango, 681 F.2d at 1104; Jurek v. Estelle, 593 F.2d 672, 685 n. 26 (5th Cir.1979) (where plaintiff alleges "arbitrary and capricious" administration of statute, plaintiff still must prove intentional discrimination), issue vacated without being addressed, 623 F.2d 929, 931 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981).
 
 
 48
 The district court's legal standard in this case is incorrect because it does not require intentional discrimination. The problem with the district court's standard is that any departure from state law would give rise to a constitutional claim. Under the district court's standard, if local government decisionmakers correctly applied a facially neutral resolution in hundreds of cases and erroneously applied it in a single case, they could never again apply it correctly without violating equal protection. A plaintiff, to whom the statute was subsequently correctly applied, could establish a denial of equal protection merely by proving that the statute was misapplied in a single previous incident and that there is no rational reason for the difference between this single previous misapplication and the subsequent correct application to him.
 
 
 49
 "A construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored." Snowden, 321 U.S. at 11-12, 64 S.Ct. at 403. The requirement of intentional discrimination prevents plaintiffs from bootstrapping all misapplications of state law into equal protection claims. "Probably no law contrived by man for his own governance ever has had or will be enforced uniformly and without exception. But the Constitution does not demand perfection." Standard Oil Co. v. Boone County Bd. of Supervisors, 562 S.W.2d 83, 84 (Ky.1978) (quoting City of Ashland v. Heck's, Inc., 407 S.W.2d 421, 424 (Ky.1966)). The equal protection clause requires no more than that state decisionmakers applying a facially neutral state not intentionally discriminate.[8]
 
 
 50
 On remand, the district court should determine whether defendants purposefully discriminated against plaintiffs. "Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); see also Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir.1982). Thus, for plaintiffs to prevail, defendants' conduct must have been deliberately based on an unjustifiable, group-based standard.[9]
 
 
 51
 Accordingly, the judgment of the district court is VACATED and this case is REMANDED for further proceedings not inconsistent with this opinion.[10]
 
 
 52
 KRAVITCH, Circuit Judge, concurring in part and dissenting in part:
 
 
 53
 Although I agree with the majority's conclusion that the judgment of the district court must be reversed, I do not find it necessary to remand the case for further proceedings. In instructing the district court to reconsider the bases of its judgment, the majority suggests that "for plaintiffs to prevail, defendants' conduct must have been deliberately based on an unjustifiable, group-based standard." With all due respect, I find this reference to group-based discrimination unrelated to the allegations of the complaint. The plaintiffs have not alleged that they were the victims of intentional, group-based discrimination. Instead, the equal protection claim consisted entirely of the following factual allegations:
 
 
 54
 Without justification, defendants have allowed additional sewage from Joseph's building. Defendants have also allowed changes in numerous other building [sic] and businesses surround E & T's building, which increase the sewage going into Patton Creek Sewage Treatment Plant. Examples include the change of a Bonanza Restaurant into a larger and businer "Po-Folks" Restaurant, an addition to the "El Palacio" Restaurant, the change of a bakery to "Incahoots" Restaurant and Bar, the building of the "Hoover Emergency Medicine South" Clinic, and others. There is no justification for treating such buildings differently than that owned by plaintiffs.
 
 
 55
 The complaint thus does not allege that the plaintiffs were denied the additional sewage allocation because they were the members of a suspect or even a quasi-suspect group. See, e.g., Plyer v. Doe, 457 U.S. 202, 216-18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). Nor does the complaint contend that the additional sewage allotment involves a "fundamental right." See, e.g., id. Consequently, the complaint alleges nothing more than that, in denying plaintiffs' application for an additional sewage allocation while granting those of others, the defendants denied the plaintiffs' rights to equal protection by acting in an arbitrary manner. See, e.g., Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971); Logan v. Zimmerman Brusch Co., 455 U.S. 422, 442, 102 S.Ct. 1148, 1161, 71 L.Ed.2d 265 (1982) (Blackmun, J., concurring).
 
 
 56
 Under this type of equal protection claim, the defendants' "intent to discriminate" is essentially irrelevant. Indeed, there can be no question but that the defendants intended to treat E & T differently from the companies which received additional sewage allotments. They did not, for example, award the additional allotments on the basis of names drawn out of a hat.
 
 
 57
 To succeed on their equal protection claim the plaintiffs must demonstrate that they were treated differently as the result of action that did not "rationally advanc[e] a reasonable and identifiable governmental objective." Schweiker v. Wilson, 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981); see City of Clebourne v. Clebourne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). This rational basis, however, need not actually have been relied upon by the governmental body: it is enough if there are "plausible reasons" for the actions.[1] U.S. Railroad Retirement Board v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); Fleming v. Nestor, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); cf. Clebourne Living Center, 105 S.Ct. at 3259-60 (considering actual grounds of governmental decision in determining that special zoning requirement was not supported by "any rational basis").
 
 
 58
 In finding that plaintiffs had prevailed on their equal protection claims, the district court relied solely on the different resolutions of the sewage allotment applications of E & T and Joseph. Assuming arguendo that E & T and Joseph were similarly situated, it is clear from the majority opinion that there were legitimate, rational, and identifiable grounds to justify the different treatment they received. The majority does not suggest that there was no rational basis for the different classifications of E & T and Joseph under the original sewage moratorium. Certainly, "grandfather" clauses similar to those included in the original moratorium consistently have been upheld against equal protection challenges. See, e.g., New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). The dispute thus centers on whether, under the moratorium as subsequently amended, Joseph was entitled to the additional sewage allotment that previously had been allocated under the prior moratorium scheme.
 
 
 59
 The majority's instructions to the district court make clear, however, that there were numerous rational and legitimate reasons supporting the Moratorium Board's decision to grant Joseph the additional sewage allotment despite the conditions that had been placed on the previous allocation. Whether these reasons in fact were the basis of the Board's decision are, for the purposes of the plaintiffs' equal protection claims, irrelevant. See Fritz, supra; Fleming v. Nestor, supra. Accordingly, I would reverse the judgment of the district court. Furthermore, as the appellees did not cross-appeal from the district court's order, I find no reason to remand the case for that court to consider other, possibly viable grounds to support the plaintiffs' equal protection claim.
 
 
 
 [1]
 Plaintiffs did not cross-appeal the dismissal of their taking and due process claims
 
 
 [2]
 It is undisputed that the Health Department never instructed that a sewer impact permit be issued for the building in which Lloyd Noland ultimately leased space. Also, no sewer impact permit had been issued for that building by July 5, 1978. The sewer impact permit for the building in which Lloyd Noland actually leased space was not issued until August, 1983
 
 
 [3]
 Factors relevant to this determination include whether an administrator in 1979 could reasonably have believed that: (a) Joseph had a colorable claim to a vested interest protected from repeal of the preliminary subdivision plan exception; (b) Joseph had a nonfrivolous claim of entitlement to a sewer connection because the many amendatory and (apparently) nonamendatory resolutions adopted by the Jefferson County Commission regarding the sewer moratorium were vague, inconsistent, or ambiguous; or (c) Joseph had a colorable claim that construction had been substantially completed because he had started building a large structure
 
 
 [4]
 The issue of intentional discrimination has been raised by the parties throughout this litigation, both at the district court and appellate levels. Complaint, Para. 17, R1, Tab 1; Answer, Second Defense, R1, Tab 16; Statement of Principal Facts Proposed to be Proved by Plaintiffs, Para. 20, R1, Tab 41; Defendants' Response to Statement of Principal Facts Proposed to be Proved by Plaintiffs, Para. 2, R1, Tab 46; Supplemental Statement of Principal Facts Proposed to be Proved by Plaintiffs, Para. 67 (Ct.Exh. 1); Defendants' Response to Plaintiffs' Supplemental Statement of Principal Facts Proposed to be Proved by Plaintiffs, Para. 67 (Ct.Exh. 1); Defendants' Response to Plaintiffs' Verified Motion to Alter or Amend Judgment, Para. 3, R1, Tab 59; Appellants' Brief, pp. 44-45
 
 
 [5]
 Equal protection claims can be divided into three broad categories. See, J. Nowak, R. Rotunda & J. Young, Constitutional Law 600 (2d ed. 1983). The first and most common type is a claim that a statute discriminates on its face. In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate state goal. Hooper, 472 U.S. at 618, 105 S.Ct. at 2866, Dandridge, 397 U.S. at 485-86, 90 S.Ct. at 1161-62. When the statute facially discriminates against certain groups or trenches upon certain fundamental interests, courts have required a closer connection between the statutory classification and the state purpose. See generally Plyler v. Doe, 457 U.S. 202, 216-18 & nn. 14-16, 102 S.Ct. 2382, 2394-95 & nn. 14-16, 72 L.Ed.2d 786 (1982) (plurality) (discussing "intermediate" and "strict" scrutiny)
 The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact. In such a case, a plaintiff must prove purposeful discrimination. See e.g., Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
 The third type of claim is that defendants are unequally administering a facially neutral statute. Plaintiffs' claim in this case falls into this third category. The equal protection standard applicable to a claim of unequal application of facially neutral legislation is materially different than that applicable to a challenge to classifications created on the face of the legislation.
 
 
 [6]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc ), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981
 
 
 [7]
 The cases upon which appellees rely are not on point. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and Wheeler v. City of Pleasant Grove, 664 F.2d 99 ((5th Cir. Unit B 1981), cert. denied, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982), involved challenges to classifications created on the face of a statute; they were not cases involving the administration of facially neutral legislation
 In the present case, no party fits or claims to fit any suspect or quasi-suspect classification such as race, gender, or alienage. Ziegler v. Jackson, 638 F.2d 776 (5th Cir. Unit B March 1981), involved the reversal of a summary judgment for defendants where a black plaintiff complained of being treated differently from similarly situated white persons in respect to the enforcement of certain legislation.
 
 
 [8]
 Appellants have not cited, and we have been unable to discover, any cases finding an equal protection violation when plaintiff applied for and was denied a government benefit, the denial was proper under the terms of a facially neutral and otherwise valid statute which leaves little or no discretion to the decisionmaker, and plaintiff complains that someone else was granted a similar benefit contrary to the statute. We do not address the thorny issue of whether an equal protection violation can ever be shown under such circimstances. If it can, plaintiff must certainly prove purposeful discrimination in order to prevail
 
 
 [9]
 Purposeful discrimination can be shown by circumstantial evidence. For example, purposeful discrimination can be indirectly proven by a "stark" pattern of adverse impact on a particular group. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). When deciding whether such a stark pattern exists in this case, the district court should consider particular misapplications of the moratorium, if any, in light of the hundreds of sewer applications that defendants have processed
 
 
 [10]
 If the district court finds no purposeful discrimination, then it should award judgment in defendants' favor. In that event, the district court need not decide whether plaintiffs were similarly situated with others who were allowed to increase their sewage
 
 
 [1]
 The majority characterizes the plaintiffs' claim as one involving the unequal administration of a facially neutral statute. See Manuscript at 1112 n. 5. Even if this characterization is accurate, it does not alter the fact that the sewage allocation to Joseph was not unconstitutional unless there is no rational basis to support the decision. The majority notes that different standards of proof are necessary in claims involving facially discriminatory statutes, facially neutral statutes resulting in a disparate impact, and unequal administration of facially neutral statutes. See id. However, the cases relied upon for these various standards each involved application of "strict" or "heightened" scrutiny. Thus, these cases are inapposite to the rational-basis claim asserted by plaintiffs here