EAST BIBB TWIGGS NEIGHBOR-
HOOD ASSOCIATION, et
al., Plaintiffs,

v.

MACON–BIBB COUNTY PLANNING &
ZONING COMMISSION, et al.,
Defendants.

Civ. A. No. 87–87–3–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 16, 1989.

See also 674 F.Supp. 1475.

Lonzy F. Edwards, Macon, Ga., for plaintiffs.

O. Hale Almand, Jr., William P. Adams, Macon, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

This case involves allegations that plaintiffs have been deprived of equal protection of the law by the Macon–Bibb County Planning & Zoning Commission ("Commission"). Specifically, plaintiffs allege that the Commission's decision to allow the creation of a private landfill in census tract No. 133.02 was motivated at least in part by considerations of race. Defendants vigorously contest that allegation. Following extensive discovery by the parties, this court conducted a non-jury trial on October 4–5, 1988. The parties were permitted to supplement the record following the conclusion of the trial. Based upon a thorough examination of the file and careful consideration of both the evidence submitted and arguments offered during the trial, the court now issues the following ruling.

### Facts

On or about May 14, 1986, defendants Mullis Tree Service, Inc. and Robert Mullis ("petitioners") applied to the Commission for a conditional use to operate a non-putrescible [1] waste landfill at a site bounded at least in part by Davis and Donnan Davis Roads. The property in question is located in census tract No. 133.02, a tract containing five thousand five hundred twenty-seven (5,527) people, three thousand three hundred sixty-seven (3,367) of whom are black persons and two thousand one hundred forty-nine (2,149) of whom are white persons.[2] The only other private landfill approved by the Commission is situated in the adjacent census tract No. 133.01, a tract having a population of one thousand three hundred sixty-nine (1,369) people, one thousand forty-five (1,045) of whom are white persons and three hundred twenty (320) of whom are black persons.[3] That site was approved as a landfill in 1978. The proposed site for the landfill in census tract No. 133.02 is zoned A–Agricultural, and the parties are in agreement that property so zoned is eligible for the construction of and subsequent operation as a landfill of this type.

On May 27, 1986, the Commission conducted a hearing on petitioners' application for a conditional use. Evidence was presented by petitioners, and certain individuals expressed various concerns about the location of the landfill in this area. The Commission deferred the decision on petitioners' application pending input from the City of Macon and the County of Bibb regarding the location of a landfill on the proposed site.

By letters dated June 5, 1986, and June 10, 1986, respectively, the County and the City responded to invitations from the Commission to participate in the evaluation of the instant application and to participate in the development of a procedure by which the City and the County actively participate in the evaluation of future applications for landfills. The Bibb County Board of Commissioners, through its Chairman, Mr. Emory Green, while expressing its appreciation for and accepting the Commission's offer to participate, stated that the Com-

1. Putrescible waste was described as waste such as household garbage which decomposes rapidly, thus requiring immediate cover. Non-putrescible waste was described as non-garbage waste, such as wood, wood by-products, paper products, corrugated products, packaging materials, metal goods, tires and refrigerators.

2. See Plaintiff's Exhibit 54. Figures are based upon 1980 census. The court notes the numerical discrepancy (3,367 + 2,199 = 5,516), but it finds such discrepancy without significance.

3. See Plaintiff's Exhibit 54.

mission had full authority to act on any such application and that any suggestion or recommendation offered by the County Commission would be for "informational" purposes only. The City, through Mayor George Israel, applauded the Commission's suggestion that a procedure be developed, but it had "no comment" regarding the specific project in question in that the project was located outside the Macon city limits. During this exchange of letters, the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources informed Mr. Mullis by letter dated May 30, 1986, that the proposed site was acceptable for disposal of non-putrescible waste.

The Commission reconvened on June 23, 1986, to consider petitioners' application. Petitioners were present and were represented by Mr. Charles Adams. Approximately one hundred fifty (150) individuals opposed to the landfill attended the Commission meeting. Numerous statements were made, and various opinions were offered. Included among those reasons offered in opposition to the landfill were the following: (1) threat to the residential character of the neighborhood; (2) devaluation of the residents' property; (3) danger to the ecological balance of the area; (4) concern regarding the possible expansion of the landfill into a public dump; (5) hazards to residents and children from increased truck traffic; and (6) dissatisfaction with the perceived inequitable burden borne by the East Bibb Area in terms of "unpleasant" and "undesirable" land uses.

Mr. Mullis and his representative, Mr. Adams, emphasized the need for an additional landfill and championed the free enterprise system as the appropriate developer and manager of such sites. They relied upon the reports supplied by Tribble & Richardson, Inc., an engineering concern with vast experience in examining proposed landfill sites, and upon the EPD's approval of the site. Petitioners further emphasized that the landfill would be managed pursuant to the existing regulations and under close supervision of the EPD.

After hearing the views of numerous individuals, the Commission voted to deny the application. The stated reasons were as follows: (1) the proposed landfill would be located adjacent to a predominantly residential area; (2) the increase in heavy truck traffic would increase noise in the area; and (3) the additional truck traffic was undesirable in a residential area. See Commission Letter dated June 30, 1986.

Pursuant to a request from petitioners through both Tribble & Richardson and Mr. Charles Adams, the Commission voted on July 14, 1986, to rehear petitioners' application. The rehearing was conducted on July 28, 1986. Applicant Robert Mullis and his representatives addressed numerous concerns which had been previously raised by citizens opposed to the landfill and by members of the Commission. Specifically, Mr. Mullis informed those present that he had met all of the existing state, city, county and planning and zoning commission requirements for the approval of a permit to operate a landfill. He also reiterated that the site had been tested by engineers and that it had been found geologically suitable for a landfill. He explained that burning, scavaging, open dumping and disposal of hazardous wastes would be strictly prohibited, and he advised that this landfill would be regulated and inspected by the EPD. Mr. Mullis and Mr. Hodges of Tribble & Richardson pointed out that the site entrance would be selected by the EPD and that such selection would be subject to approval by the Commission. Mr. Mullis assured those present that the site would be supervised at all times. Finally, Mr. Mullis informed the Commission and the other participants that the buffer zone would be increased an additional fifty (50) feet, from one hundred (100) feet to one hundred fifty (150) feet, in those areas where the landfill site adjoined residences. Also included in the record was a letter dated July 15, 1986, in which Mr. Mullis stated that there existed only five residences contiguous to the proposed landfill site and only twenty-five houses within a one mile radius of the site.

The citizens opposing the landfill voiced doubts about the adequacy of the buffer

zone and the potential health threats from vermin and insects. Concerns were expressed regarding the impact the landfill might have upon the water in the area in that many of the residents relied upon wells for their household water. Certain of the participants questioned whether the residents of this area were subject to the same considerations afforded residents in other areas of the city and county when decisions of this nature were made.

When the above-mentioned allegations of unfairness were raised by opponents to the landfill, Commission Chairperson Dr. Cullinan expressed concern regarding that perception. He stated as follows:

I'm interested in your comments about manipulations and information may have been passed subrosa in some way. I'm interested in that because I think government and ultimately democracy functions on the legitimacy of its purpose and if people don't have faith in their institutions, the system won't work. They may not like all of the decisions that government institutions make, but I would feel badly if they thought that there was some sort of conspiracy a foot and I can tell you that I received a number of calls before and after my own meanderings through that land and I received no calls from big corporate people asking me to vote a particular way. Although, I did receive numerous calls from people in the area. Although, I can't speak for the other commissioners feeling is that their experiences are similar to mine. I think that the record should show to the best of this chairman's knowledge there is not manipulations or conspiracies a foot and if you have such information I would be interested in having it entered into the record.

Defendant's Exhibit D–P & Z–3, Transcript of July 28, 1986, Hearing. Dr. Cullinan further stated that "anything that I have any knowledge of will be in the record. We're not going to let vague charges of conspiracy go unchallenged here. We want this Board to be a legitimate Board and speak to the will of all of the people...." *Id.*

At the conclusion of the discussion, the Commission deliberated and voted.[4] The Commission approved the application subject to the following conditions: (1) approval by the county engineer; (2) approval or permits from all applicable state and federal agencies; (3) restriction on dumping of all but non-putrescible materials; and (4) review and approval by the Commission of the final site plan. See Commission Letter dated August 1, 1986.

On November 10, 1986, the Commission approved the final site plan for the landfill. On November 20, 1986, the EPD issued a permit to Mullis Tree Service conditioned upon the permitee complying with the following conditions of operation:

1. No hazardous or putrescible waste shall be deposited at the landfill.

2. Materials placed in the landfill shall be spread in layers and compacted to the least practical volume.

3. A uniform compacted layer of clean earth cover not less than one (1) foot in depth shall be placed over all exposed waste material at least monthly or more frequently as may be determined by the division.

4. The disposal site shall be graded and drained to minimize runoff onto the landfill

---

**4.** Each Commissioner articulated his or her position on the record. Each Commissioner noted the difficulty of the decision. Mr. Pippinger emphasized the forthright approach taken by petitioner and the approval given by the Environmental Protection Division for the proposed landfill. He stated that his decision to vote in favor of the application was based upon "all of the details [,] the use of the land and the facts and conclusions that I have gleamed (sic) out of this." Commissioner Ingram voted "no" on petitioners' application, citing the need for a comprehensive approach to the waste problem and the impropriety of reconsidering petitioners' application after initially denying same. Chairperson Cullinan voted in favor of petitioners' application, and he stated as follows: "We can't rule on sites until they are brought to use. This site was brought to us.... If others are brought to us in North Macon, South Macon, West Macon, we have to be as deliberative and as thoughtful and make an independent assessment there to see whether in fact the land use is adequate." The motion to approve petitioners' application carried three votes to one vote.

surface, to prevent erosion and to drain water from the surface of the landfill.

5. The landfill shall be operated in such manner as to prevent air, land, or water pollution, public health hazards or nuisances.

6. Access to the landfill shall be limited to authorized entrances which shall be closed when the site is not in operation.

7. Suitable means shall be provided to prevent and control fires. Stockpiled soil is considered to be the most satisfactory fire fighting material.

8. The Design and Operational Plan submitted by the permittee and approved by the Division for this landfill is hereby made a part of this permit and the landfill shall be operated in accordance with the plan.

9. This permit shall become null and void one year from the effective date if the permitted disposal operation has not commenced within one year from the effective date.

### Discussion

■ "To prove a claim of discrimination in violation of the Equal Protection Clause a plaintiff must show not only that the state action complained of had a disproportionate or discriminatory impact but also that the defendant acted with the intent to discriminate." *United States v. Yonkers Board of Education*, 837 F.2d 1181, 1216 (2nd Cir.1987), *cert. denied,* ─ U.S. ─, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir.1987), *cert. denied,* ─ U.S. ─, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). A plaintiff need not establish that "the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464–65

(1977). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. Considerations include the following: (1) the impact of the official action—whether it bears more heavily on one race than upon another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) any departures, substantive or procedural, from the normal decision-making process; and (5) the legislative or administrative history of the challenged decision. *Id.* at 266–68, 97 S.Ct. at 564–65, 50 L.Ed.2d at 465–66.

■ Having considered all of the evidence in light of the above-identified factors, this court is convinced that the Commission's decision to approve the conditional use in question was not motivated by the intent to discriminate against black persons. Regarding the discriminatory impact of the Commission's decision, the court observes the obvious—a decision to approve a landfill in any particular census tract impacts more heavily upon that census tract than upon any other. Since census tract No. 133.02 contains a majority black population equalling roughly sixty percent (60%) of the total population, the decision to approve the landfill in census tract No. 133.02 of necessity impacts greater upon that majority population.

However, the court notes that the only other Commission approved landfill is located within census tract No. 133.01, a census tract containing a majority white population of roughly seventy-six percent (76%) of the total population. This decision by the Commission and the existence of the landfill in a predominantly white census tract tend to undermine the development of a "clean pattern, unexplainable on grounds other than race...." *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465.

Plaintiffs hasten to point out that both census tracts, Nos. 133.01 and 133.02, are

located within County Commission District No. 1, a district whose black residents compose roughly seventy percent (70%) of the total population. Based upon the above facts, the court finds that while the Commission's decision to approve the landfill for location in census tract No. 133.02 does of necessity impact to a somewhat larger degree upon the majority population therein, that decision fails to establish a clear pattern of racially motivated decisions.[5]

Plaintiffs contend that the Commission's decision to locate the landfill in census tract No. 133.02 must be viewed against an historical background of locating undesirable land uses in black neighborhoods. First, the above discussion regarding the two Commission approved landfills rebuts any contention that such activities are always located in direct proximity to majority black areas. Further, the court notes that the Commission did not and indeed may not actively solicit this or any other landfill application. The Commission reacts to applications from private landowners for permission to use their property in a particular manner. The Commissioners observed during the course of these proceedings the necessity for a comprehensive scheme for the management of waste and for the location of landfills. In that such a scheme has yet to be introduced, the Commission is left to consider each request on its individual merits. In such a situation, this court finds it difficult to understand plaintiffs' contentions that this Commission's decision to approve a landowner's application for a private landfill is part of any pattern to place "undesirable uses" in black neighborhoods. Second, a considerable portion of plaintiffs' evidence focused upon governmental decisions made by agencies other than the planning and zoning commission, evidence which sheds little if any light upon the alleged discriminatory intent of the Commission.

Finally, regarding the historical background of the Commission's decision, plaintiffs have submitted numerous exhibits consisting of newspaper articles reflecting various zoning decisions made by the Commission. The court has read each article, and it is unable to discern a series of official actions taken by the Commission for invidious purposes. *See Village of Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 465. Of the more recent articles,[6] the court notes that in many instances matters under consideration by the Commission attracted widespread attention and vocal opposition. The Commission oft times was responsive to the opposition and refused to permit the particular development under consideration, while on other occasions the Commission permitted the development to proceed in the face of opposition. Neither the articles nor the evidence presented during trial provides factual support for a determination of the underlying motivations, if any, of the Commission in making the decisions. In short, plaintiffs' evidence does not establish a background of discrimination in the Commission's decisions.

"The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purpose." *Village of Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 466. Plaintiff identifies as the key piece of evidence in this regard a statement contained in "Action Plan for Housing,"[7] a study of the status of housing in the Macon area conducted by the Macon–Bibb County Planning and Zoning Commission. The study states that "[r]acial and low income discrimination still exist in the communi-

---

5. The court further finds it clear that the Commissioner's decision to approve petitioners' application is not a "single invidiously discriminatory act" which makes the establishment of a clear pattern unnecessary. *See Village of Arlington Heights*, 429 U.S. at 266 n. 14, 97 S.Ct. at 564 n. 14, 50 L.Ed.2d at 465 n. 14.

6. Several of the articles date from the late 1950's and the early 1960's. At least one article dates from 1940, and another dates from 1950. Those articles printed in the past fifteen years or so received primary consideration by the court as more representative of the Commission's activity. However, the court read each article.

7. See Plaintiffs' Exhibit 52, p. 33.

ty."[8] The study was issued in March of 1974, and it constitutes a recognition *by* the Commission that racial discrimination still existed in the Macon community in 1974. That recognition in no way implies that racial discrimination affected the decision-making process of the Commission itself. Rather, the statement indicates the Commission's awareness that certain individuals and/or groups in society had yet to come to grips with the concept of equality before the law. The Commission's recognition of the situation does not constitute its adoption. Indeed, such recognition probably encourages that Commission to exercise vigilance in guarding against such unprincipled influence. The statements of the various Commissioners during their deliberations indicates a real concern about both the desires of the opposing citizens and the needs of the community in general.

In terms of other specific antecedant events, plaintiffs have not produced evidence of any such events nor has the court discerned any such events from its thorough review of the record. No sudden changes in the zoning classifications have been brought to the court's attention. Plaintiffs have not produced evidence showing a relaxation or other change in the standards applicable to the granting of a conditional use. Thus, this court finds no specific antecedent events which support a determination that race was a motivating factor in the Commission's decision.

Plaintiffs contend that the Commission deviated from its "normal procedures" in several ways. First, plaintiffs point to the Commission's efforts to encourage input from the County and the City. These efforts do not constitute evidence that "improper purposes are playing a role"[9] in the Commission's decision. The statements of the Commissioners make clear that such efforts had their genesis in the Commission's concerns about accountability to the public for certain controversial governmental decisions and about centralized planning for the area's present and future waste disposal problems.

Plaintiffs' contentions regarding other alleged procedural irregularities, including the requirement that the Commission make certain findings of fact and that a rehearing was improperly granted, are without merit. The court has examined the Comprehensive Land Development Resolution in light of the actions taken and has been unable to identify any procedural flaws.[10]

The final factor identified in *Village of Arlington Heights* involves the legislative or administrative history, particularly the contemporary statements made by members of the Commission. Plaintiffs focus on the reasons offered by the Commission for the initial denial of petitioners' application, *i.e.*, that the landfill was adjacent to a residential area and that the approval of the landfill in that area would result in increased traffic and noise, and they insist that those reasons are still valid. Thus, plaintiffs reason, some invidious racial purpose must have motivated the Commission to reconsider its decision and to approve that use which was at first denied. This court, having read the comments of the individual commissioners, cannot agree with plaintiffs' arguments.

Mr. Pippinger, who first opposed the approval of the conditional use, changed his position after examining the area in question and reviewing the data. He relied upon the EPD's approval of the site and upon his determination that the impact of the landfill on the area had been exaggerated. Mrs. Kearnes, who also inspected the site, agreed with Mr. Pippinger.

Dr. Cullinan also inspected the site. After such inspection and after hearing all of the evidence, he stated that, based "on the overriding need for us to meet our at large

---

**8.** The court believes this evidence is more probative of the "historical background of discrimination" than it is indicative of the specific sequence of events leading up to the challenged decision. Even considered in the historical context, the statement neither admits nor indicates that such discrimination existed in the Commission itself.

**9.** *See Village of Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 466.

**10.** See Plaintiffs' Exhibit 4, particularly §§ 6.03, 23.14, 27.07, 27.12, 27.13, 27.14 and 27.15.

responsibilities to Bibb County I feel that [the site in question] is an adequate site and in my most difficult decision to date I will vote to support the resolution." Transcript of July 28, 1986, Commission Meeting.

Both Dr. Cullinan and Mr. Pippinger were concerned with the problems of providing adequate buffers protecting the residential area from the landfill site and of developing an appropriate access to the site for the dumping vehicles. These concerns were in fact addressed by both the Commission and the EPD.

The voluminous transcript of the hearings before and the deliberations by the Commission portray the Commissioners as concerned citizens and effective public servants. At no time does it appear to this court that the Commission abdicated its responsibility either to the public at large, to the particular concerned citizens or to the petitioners. Rather, it appears to this court that the Commission carefully and thoughtfully addressed a serious problem and that it made a decision based upon the merits and not upon any improper racial animus.

For all the foregoing reasons, this court determines that plaintiffs have not been deprived of equal protection of the law. Judgement, therefore, shall be entered for defendants.

SO ORDERED.